## Keaton et al. v. Keaton et al.

May 7, 1943.

B. J. Bethurum and J. P. Harrison for appellants.
Duncan & Duncan and J. M. Kennedy for appellees.

OPINION OF THE COURT BY JUDGE SIMS—Affirming.

In 1916 John Keaton purchased a tract of land known as the Oatts farm for $33,500, of which his then wife, Kate, furnished $2,500 of the purchase price, and in 1919 he purchased a tract called the Barleston farm for $7,000, of which she furnished $2,000. There is evidence in the record that John agreed with Kate when she furnished these sums that title to each tract would be taken in their joint names showing her proportionate interest therein, but by oversight or mistake on the part of the husband this was not done and both deeds were made to him alone. The wife died on January 18, 1921, thinking each deed showed her interest in the lands conveyed.

On February 19, 1921, John Keaton and Sam Cos-

tello, a brother of Kate, borrowed $16,500 from G. A. Keaton and his sons, Henry and Jake, who were cousins of John. Sam actually borrowed this money with John signing his note as surety. When Sam ran into financial difficulties, John took title to a tract of land known as the Coffey farm in which the former had invested the borrowed money. In 1923 John mortgaged both the Oatts and Barleston tracts to the Federal Land Bank for $14,-000. G. A. Keaton and his sons became concerned as to the security of their debt and in 1926 requested a mortgage from John, which he and his then wife, Nannie, executed to them on the Oatts and Barleston farms. They foreclosed this mortgage in 1929, at which time their debt and interest aggregated $21,000 or $22,000, and at the subsequent decretal sale they became the purchasers of the lands for $29,565 out of which the balance of $13,628 due on the prior mortgage of the Federal Land Bank had to be satisfied, leaving a deficiency judgment of between $6,000 and $7,000.

Mary and Shelby Keaton, the only surviving children of Kate, instituted this equitable action in 1941 against their father John and his then wife, Nannie, wherein they asked a personal judgment for $4,500 against John and that they be adjudged a lien on the Oatts and Barleston farms in this sum. The ground of their action was that John had invested their mother's money in these lands under an agreement to take title thereto in his and her names and as he had violated this agreement and had taken title solely in his name without her consent, a resulting trust was created in the lands in favor of their mother and as her sole heirs they were entitled to its benefit. See Roche v. Roche, 188 Ky. 327, 222 S. W. 86. The petition alleged that G. A. and Henry Keaton died intestate and their heirs together with Jake were made defendants. The amended petition alleged that G. A., Henry and Jake Keaton knew in 1921 when they made the loan to John that Kate had invested $4,500 in these lands with the agreement by John that he would take title in their joint names, which by mistake or oversight he had failed to do.

It appears that in the settlement of the estates of his father and brother, Henry, Jake acquired title from Henry's heirs to the lands involved in this controversy and as John was insolvent, Jake and his wife were the only parties who defended this action. Their answer was

a traverse followed by an affirmative plea that they had no knowledge or information that Kate had invested any money in the lands or had any agreement with her husband by which title was to be taken in their joint names, and that Jake was an innocent purchaser for value. A reply completed the issue.

Hon. Lilburn Phelps, special judge, was the chancellor who tried the case. After hearing the proof orally he rendered a full and well-considered opinion deciding that although the evidence established a resulting trust under the first exception contained in KRS 381.170, it failed to show that G. A. Keaton and his two sons had notice of the latent equity of Kate at the time they made the loan to her husband, therefore he ordered the petition dismissed.

It is insisted by appellants that the chancellor's judgment should be reversed as being clearly against the weight of the evidence. While appellees urge: (a) That as this is a suit to recover money, appellants were without authority to bring it as heirs of their mother, but it should have been instituted by her personal representative; (b) that the trust was established by the testimony of appellant's father who was an incompetent witness under Section 606, subsections 1 and 2, of the Civil Code of Practice to testify as to confidential communications with his wife, or to testify for himself as to statements or transactions with his deceased wife.

As we have reached the conclusion that the chancellor's finding is not against the weight of the evidence and must be sustained, it is not necessary for us to pass upon the two questions raised by appellee. We will assume, without deciding, that appellants could maintain this action; likewise it will be assumed, but not decided, that the husband was a competent witness as to communications between him and his deceased wife and as to transactions with her.

Appellants introduced their half-brothers, Guy and James Bryan Keaton, to prove that Jake, his father and brother, Henry, knew at the time they made the loan to John that Kate's money had gone into the lands and that the title thereto was wrongfully taken by her husband in himself with her name omitted from the deeds. Guy's testimony in effect was that the day after the loan was made to his father, Henry asked him how much

Kate had invested in the lands. On two or three subsequent occasions Jake or Henry asked him practically the same question, saying they knew her money went into them but did not know how much. James Bryan Keaton testified in substance that he was 8, 10, or 12 years of age when his father obtained this loan and sent him to the road to receive a $2,500 check from Henry, who upon delivering it inquired of him how much of Kate's money went into the lands. Guy and James Bryan answered such inquiries by saying Kate put her money in these lands although they did not know the amount thereof, but they never mentioned the fact her name was to appear in the deeds. John testified that he told Jake and Henry that Kate invested her money in the lands, but he does not say whether this conversation was before or after he obtained the loan from them. Nor did John mention to them his agreement with Kate that her name was to appear in the deed and that he failed to carry it out.

Jake's testimony is to the effect that when the loan was made, John did not mention that any of Kate's funds had been invested in the lands; that the record title was then in John and the credit was extended to him on the strength of it; that during the pendency of the foreclosure suit no mention was made of the fact that Kate had been interested in the lands; that he had never told Guy or James Bryan Keaton he knew Kate had some interest in the lands but did not know how much.

The rule is well-settled that KRS 381.170 cannot be invoked to aid a wife in defeating a husband's creditors whose debts were contracted in good faith after he took title to the wife's property and without notice of the fact that she furnished the money under an agreement the deed would be taken in her name.

> "It would be manifestly unfair to creditors to let the wife take the land on the faith of which the husband was allowed to create debts. * * * This statute is only intended to assist persons paying the consideration to reclaim property while it is in the possession of the person who took the deed to himself in violation of the trust, without the consent of the person paying the consideration, or, while it is held by a volunteer or a purchaser with notice of the trust, it does not apply when the rights of credi-

tors or purchasers in good faith and without notice have intervened.''

Miller v. McLin, 147 Ky. 248, 143 S. W. 1008, 1009; Phillips v. Bowles, 209 Ky. 580, 273 S. W. 85; Thrasher v. Craft, 242 Ky. 101, 45 S. W. (2d) 827; Foster v. Miller, 256 Ky. 48, 75 S. W. (2d) 534.

Under the conflicting proof to which reference has been made, we cannot say that the chancellor's finding that Jake, his father and brother did not know Kate's money had been invested in the lands at the time they made the loan to John was against the weight of the evidence. It will be noticed that the proof does not even intimate that G. A. Keaton and his sons at the time of, or before, making the loan knew of the agreement between Kate and her husband whereby the deeds were to be taken in their joint names, and that the lenders had such knowledge at such time would have to be shown before the wife's children could defeat Jake's title.

The judgment is affirmed.